**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

BJØRNULF ØSTVIK, individually,
Plaintiff,

Civil Action No. 4:26cv264 SDJ/AGD

v.

**JURY TRIAL DEMANDED**

RICK SANTORUM, individually,
JEFFORY BLACKARD, individually, and
ZERO GLOBAL WASTE, LLC,
Defendants.

**COMPLAINT FOR INJUNCTIVE RELIEF, CANCELLATION OF TRADEMARK REGISTRATIONS, AND DAMAGES**

**INTRODUCTION**

1. On August 2, 2021, former United States Senator Rick Santorum wrote directly to the Prime Minister of the Republic of Croatia warning of "a vital issue pertaining to sensitive American Technology that is currently being compromised by known corrupt influences inside of Croatia." Senator Santorum described the technology as "transformational" and stated that it "has attracted a great deal of attention in the American government." (Exhibit A.) Plaintiff Bjørnulf Østvik knew nothing of the letter until it surfaced in an audit.

2. The technology at issue is Dynamic Organic Repolymerization ("DOR"), a constructive thermochemistry process discovered by Plaintiff Bjørnulf Østvik. DOR can convert the Earth's surface carbon resources (including even solid waste) into advanced engineered materials. Plaintiff had disclosed his pathogen neutralization research to Defendants a year earlier, and earlier that year shared information about his Project Phoenix, a program to develop engineered composites. Defendants learned of Plaintiff's work in potential military, aerospace, and wastewater

applications. Defendants knew the full scope and what was at stake, and raced to gain control of the situation, while minimizing their descriptions to a coal-substitute fuel.

3. Senator Santorum is a shareholder and Board member of Zero Global Waste, LLC ("ZGW"), the company that purchased the world's first EGS-5000L modular system, now designated by Plaintiff as the "Rhino", and installed it in Croatia. Plaintiff and his team designed this ruggedized modular system specifically to implement DOR on bulky solid waste feedstocks. Santorum reported that the first operations of the system had been "very successful" but feared a prominent Croatian business magnate would "steal our technology." In fact, Santorum warned the magnate might "hold the machine hostage indefinitely." The real threat was not a single copy of a machine being stolen; Senator Santorum even wrote to the Prime Minister in the same letter that they had already ordered more systems and aimed to order 60 for a site in Novi Marof. The real threat was misappropriation of DOR, and all the sensitive applications.

4. Plaintiff did not authorize, nor was consulted about, nor even knew of Senator Santorum's letter to a foreign head of state, the U.S. Senate Committee on Environment and Public Works, a sitting U.S. Senator, the U.S. Embassy in Croatia, and even involvement by the FBI Legal Attaché in Zagreb, nor invitations to U.S. Senators and EPA officials to view Plaintiff's technology. (Exhibits B, C.)

5. An entire diplomatic frenzy was underway, U.S. government officials were being courted without Plaintiff's knowledge, Blackard was boasting -- or warning - about senior Texas state officials he counted as his friends, and all the while Defendants were focused on one thing with the Plaintiff: pressuring him. Pressure for more territory rights for no money down. Pressure to send sensitive technical information to foreign parties. Pressure to relinquish manufacturing

rights, so they could become the producer of the goods. Pressure to focus on fuel. Pressure to sign documents. That was only the beginning.

6. Plaintiff owns a broad set of intellectual property rights related to DOR. Many of his patents have been assigned to the company he founded, Ecogensus LLC, that builds Rhino machines optimized for bulky waste feedstocks. This case is about much more. Plaintiff personally owns the trademarks for the process name itself and engineered substrate material, called EGS-6, that forms a platform material at the center of a broad set of applications. Defendants, backed by a Who's Who list of Dallas Oil & Gas families, wanted to reduce this to an energy play. The Oil & Gas industry should not be a natural adversary nor sense a competitive threat. Plaintiff chose to move operations to Houston precisely because of its world-class fabrication and manufacturing ecosystem, along with a strong supply chain locally. His technology creates new value from surface carbon resources; it does not compete with conventional energy extraction (at least not on any meaningful time horizon). It is a new resource, new potential value to the Texas economy and additive to the national economy. A collaborative relationship with ZGW's investors, many of whom are leaders in the Texas energy community, would have been Plaintiff's preferred outcome, and would have been good for everyone involved. Repeatedly, Plaintiff tried to show diplomacy, willingness to partner, thinking concession to the asymmetric reality may be prudent. It was not enough for Defendants nor for, at least, their coordinating partners.

7. Only a few months before the Croatian crisis, Defendant Blackard had written a letter to Plaintiff stating that he anticipated ZGW could purchase what equated to more than $4.5 billion in equipment sales for its limited territory abroad in just the next five years, which would also have created ongoing royalty and licensing revenue streams. (Exhibit D.) Defendant Blackard had by then had the first Rhino commissioned and operating, and ZGW had even performed extreme

unauthorized stress-tests on it using nonsensical materials for which it wasn't designed (large bags of dirt, automotive sealant foams). They praised the performance of the technology. In an internal 2021 partner's update, recovered in a later audit, they wrote "Tests were attended and observed by Zero Global Waste representatives, including Partner Mike Allen, and many engineering and environmental consultants, all of whom contributed to Zero Global Waste's verification of the System's performance. Test results in Figure 10 corroborate the significant testing done by Ecogensus on their American-based test Systems." Their independent tests showed they were producing engineered fuel that was 33.8% higher in energy content than regional coal, and 95.5% lower in sulfur. (Exhibit G.) They shared none of this with Plaintiff, instead they feigned frustration that a vacuum pump needed cleaning -- after they deliberately ran automotive parts in the system. When these fabricated pretexts for "needing" to manufacture themselves did not work, they turned to pressure tactics.

8. Senator Santorum and Defendant Blackard knew what they were doing. In early 2020, they showed Plaintiff a market analysis, boasting they believed their limited territory even then was worth billions of dollars. On information and belief, based on Defendants showing the physical report cover to Plaintiff, this study was produced by Deloitte and ZGW had also engaged a number of other experts to validate the various aspects of Plaintiff's technology. This included, as Blackard repeatedly emphasized, ongoing help from Larry O'Donnell, the former President and COO of Waste Management, Inc.

9. Less than eight months after Senator Santorum championed the technology to the Croatian Prime Minister, ZGW secretly filed applications to register two trademarks in the United States, "CIRCULÜM" and "EDUNITE," for the process (DOR) and substrate material that results from mixed carbon feedstocks (EGS-6). ZGW had no authority to rename or claim these, they had

no rights to produce Rhino systems, and they had no rights whatsoever in the United States. They were only a customer with one Rhino system, in Croatia, and a limited right to run the DOR process and make EGS-6 in systems they purchased. In order to create the appearance of consent, ZGW's own specimens filed with the USPTO state the process was "invented by Bjornulf Ostvik," is "utilized in Ecogensus systems," and is "a globally patented process." Plaintiff never authorized (nor knew of) the filings, never consented to the branding, and did not learn of the registrations until nearly four years later. (Exhibits E, F.)

10. What followed in 2022 was a sustained campaign of pressure and misrepresentation designed to force Plaintiff to surrender control of both his personal intellectual property and the companies commercializing it. They wanted manufacturing rights. They wanted U.S. rights. India. Brazil. All of Africa. Europe. No money down. When Plaintiff said no, the intimidation ramped up. The campaign included direct threats to Plaintiff's phone (Senator Santorum texting "I assure you I am trying to help you avoid real discomfort") (Exhibit H), asking a Dallas pastor to call Plaintiff's phone and leave a prayer for his family, outreach to Plaintiff's own board members, false and misleading statements about foreign lawsuits, and a brazen proposal to Plaintiff to hand over control of his intellectual property and his companies, and consolidate them into a licensing/holding company.

11. The proposal to buy-off Plaintiff was routed through Senator Santorum's associate (ironically, a former in-house counsel for Plaintiff) and, as suggested, would be arranged by that associate's firm, for which neither Plaintiff nor his advisors could find any broker-dealer registration. Plaintiff was advised of the real interests behind the offer. Despite Ecogensus alone having achieved negotiated valuations of $400 million in recent years, and Plaintiff owning a majority, the buyoff proposal suggested an amount equal to 0.875% to 1.875% of Ecogensus' prior

valuation alone. "We recognize this range is wide" wrote Santorum's associate. They would determine the final buy-off amount once Plaintiff handed over: financial statements for all Plaintiff's companies, a summary of all his patents and patent applications throughout the world, all customers, and various other sensitive information.

12. Senator Santorum's associate later explained in a writing to Plaintiff that the buy-off was intended "to give you enough money to take a rest, get some perspective and allow someone else to take the companies to the next level." Had Plaintiff taken this buy-off, his other co-investors would have been trapped inside the resulting licensing 'holding company'. Nevertheless, Senator Santorum's associate wrote to Plaintiff that he and his partners were confident they could obtain consents from these co-investors "without disparaging" Plaintiff, as if that qualification did not itself expose the contemptuous nature of the scheme. In fact, this scheme is ongoing as of this filing, as Defendants continue to coordinate with others in seemingly frenzied attempts to fabricate a pretextual narrative to gain control of the technology, while preemptively attempting to undermine Plaintiff's credibility, including by repeatedly branding anticipated claims of coordinated misconduct as 'conspiracy' theories or "alleging RICO" -- a tactic that itself exposes the very coordinated enterprise Plaintiff has not yet alleged.

13. In a continued effort to undermine Plaintiff, throughout the past four years, extraordinary efforts have been taken by Defendants and their agents to silence Plaintiff, his colleagues and advisors. Agents and representatives of Defendants sent threats, repeatedly, of criminal prosecution in Croatia for truthful statements made in a prior U.S. judicial proceeding, demanding public retraction of sworn testimony. ZGW's own Texas-based counsel has threatened that multiple third parties in Romania and Croatia will bring claims for "false and defamatory statements made in its public filings." These threats to punish protected testimony given in United

States judicial proceedings, the very activity in which Plaintiff is now engaged by filing this Complaint, constitute a flagrant perversion of the judicial process and are calculated to deter Plaintiff from ever bringing these matters before a U.S. court. Indeed, a ZGW shareholder recently threatened "warfare" if Plaintiff does not quietly acquiesce. The very existence of this threat reveals the scheme for what it is, nothing would have otherwise stopped Defendants from simply being the customer they originally claimed to be.

14. The Lanham Act claims in this Complaint address Defendants' unauthorized registration of CIRCULÜM and EDUNITE, marks that ZGW was never authorized to create, file, or own, and the use of Plaintiff's name and identity in those registrations to create a false impression of affiliation, sponsorship, or approval. Those violations are a concrete and ongoing manifestation of this broader campaign to seize control of Plaintiff's personal intellectual property rights, force a distressed sale of his interests at a fraction of its valuation, become the producer of Rhino systems, and rebrand his entire technology framework under names owned by ZGW. ZGW filed the trademark applications at a time when it had no right to produce the systems, no U.S. rights, and no authorization to rename Plaintiff's technology, yet filed intent-to-use applications representing a bona fide intent to use those marks in U.S. commerce. ZGW was never the producer or origin of the goods, though it mounted an extraordinary pressure campaign to become that. The only rational explanation for such filings is that Defendants expected to acquire those rights from Plaintiff, whether by agreement or by pressure. Everything that followed confirms this was the intent. But they never acquired those rights. They still have not, yet they are still trying. Those trademark filings now exist as the canary in the coal mine, revealing the scheme for what it is. Plaintiff brings this action in his individual capacity because the trademarks at issue, along with the broader personal intellectual property they purport to rename, are his personal property.

15. Plaintiff's investigation is ongoing and the scheme described herein is believed to extend substantially beyond what is alleged in this initial complaint. The facts set forth herein are based on Plaintiff's personal knowledge, documents in Plaintiff's possession, and publicly available information. Substantial additional evidence bearing on the full scope, purpose, and beneficiaries of this scheme remains in the exclusive possession of Defendants and their agents, and will be the subject of targeted discovery. Plaintiff reserves the right to amend this Complaint as a matter of course to join additional parties and to assert additional claims. Plaintiff further reserves the right to seek leave to amend the Complaint to assert additional claims once the full scope of Defendants' coordination is confirmed

## PARTIES

16. Plaintiff Bjørnulf Østvik ("Plaintiff" or "Østvik") is an individual residing in Harris County, Texas. Plaintiff holds two degrees from Cornell University, a J.D. from George Washington University Law School, and previously directed advanced technology programs at Lockheed Martin Corporation. Plaintiff's career includes work with Sandia National Laboratories, the founding of a specialized civil engineering firm, and leadership roles at technology companies. Plaintiff invented the thermochemical process at issue in this case, which he designated Dynamic Organic Repolymerization ("DOR"). He is the named inventor or co-inventor on more than one hundred patents granted across fifteen G20 nations. He has additional non-public filings that further expand the DOR field beyond the scope of any assigned patents. DOR is a broad process for converting surface carbon resources into polymeric composite materials, which fits within the constructive thermochemistry scientific framework that Plaintiff first articulated. Plaintiff designated the resulting material "EGS-6," a reference to carbon as the sixth element. EGS-6 serves as a platform material with applications ranging from engineered building materials to advanced

carbon composites. Plaintiff's research includes military and aerospace applications that are matters of U.S. critical resource supply targets. He owns the DOR designation and the EGS-6 trademarks. Both are personal intellectual property of Plaintiff.

17. Plaintiff founded Ecogensus, LLC ("Ecogensus"), a Delaware limited liability company, to commercialize specific implementations of his technology. In particular, Ecogensus is the producer of the Rhino modular system, designed by Plaintiff together with his engineering team, which processes mixed solid wastes into EGS-6, an engineered substrate material. Plaintiff contributed certain patents to Ecogensus covering particular feedstock combinations, processing parameters, and system configurations. Ecogensus is permitted to use designations such as DOR and EGS-6 terminology under supervision by Plaintiff, pursuant to a revocable license. The Board of Managers of Ecogensus has authorized Plaintiff's use of Company documents in legal proceedings brought in his individual capacity, by unanimous written consent.

18. Defendants' conduct directly injures Plaintiff by: (i) misappropriating his name and identity in federal filings; (ii) claiming ownership, under names they were not authorized to register, of a process and product they were only permitted to use under strict guidelines when they purchased systems under a supply agreement; (iii) conducting an unauthorized diplomatic campaign using Plaintiff's technology to court foreign heads of state and U.S. government officials without Plaintiff's knowledge; and (iv) waging a sustained pressure campaign to force Plaintiff to surrender control of intellectual property that Defendants knew encompassed applications far beyond what they chose to disclose to others.

19. Defendant Rick Santorum ("Santorum") is a former United States Senator from the Commonwealth of Pennsylvania. On information and belief, Santorum splits his time between Texas, Virginia, and Pennsylvania. Santorum is a shareholder and board member of ZGW.

Santorum signed the letter to the Croatian Prime Minister as "Partner" on ZGW letterhead. (Exhibit A.) On information and belief, Santorum personally participated in and directed ZGW's strategy with respect to the technology at issue, including writing to the Croatian Prime Minister on ZGW's behalf, personally pressuring Plaintiff to capitulate to ZGW's demands, and enlisting third parties, including clergy, and other partners, to contact Plaintiff or his advisors on Defendants' behalf.

20. Defendant Jeffory Blackard ("Blackard") is the Chief Executive Officer and a principal of ZGW. Blackard signed the license agreements governing ZGW's relationship with Ecogensus, authored the Q3 2021 Partners Update describing Plaintiff's technology, communicated with the U.S. Embassy regarding the Croatian situation, and either directed or authorized the filing of the trademark applications at issue. On information and belief, Blackard directed or authorized third parties, including foreign security firms and ZGW's legal counsel, to send threatening communications directly and indirectly to Plaintiff and his colleagues in connection with testimony given in U.S. judicial proceedings and threats of bringing criminal proceedings in Eastern Europe unless Plaintiff yielded contractual rights to ZGW. As CEO, Blackard had operational authority over ZGW's intellectual property strategy.

21. Defendant Zero Global Waste, LLC ("ZGW") is a Texas limited liability company with its principal place of business at 401 Adriatic Parkway, McKinney, Texas 75071 (Collin County). ZGW is the registrant of U.S. Trademark Registration Nos. 7,148,566 ("EDUNITE") and 7,580,623 ("CIRCULÜM"). ZGW has a single processing system purchased years ago from a company founded by Plaintiff and has operated under five iterations of limited equipment (Rhino) supply and right-to-use agreements over nearly the last 9 years covering a European territory and, at various points, options for certain other countries (Brazil, Nigeria).

22. Non-party Providence Energy, Inc. ("Providence") is an investor in and shareholder of ZGW, providing on information and belief eighty percent (80%) of ZGW's initial capitalization in August 2017. Non-party Michael Allen ("Mike Allen") is the chairman of Providence and a board member of ZGW. Non-party William Allen ("Will Allen") is a principal of Providence and, on information and belief, leads all non-oil and gas activity for Providence.

23. Non-party Lee Beaman is a close friend of Senator Santorum, a shareholder of ZGW and, on information and belief, a resident of Tennessee. In early 2016, Senator Santorum introduced the Glen Leven Limited Partnership and asked if it could purchase equity shares in Ecogensus. A $400,000 share purchase was executed by Lee Beaman, as President of a firm called Canyon Properties, Inc., which was represented as the General Partner of the Glen Leven Limited Partnership. The agreement made certain representations. Plaintiff spoke briefly in early 2016 with Lee Beaman and has never heard from him since. On information and belief, when Senator Santorum was involved in setting up and capitalizing ZGW around August 2017, he went on a fishing trip with Lee Beaman where he discussed ZGW's capital strategy and needs. An audit discovered that Lee Beaman funded at least $750,000 to ZGW, from April 2021 to November 2021. (Exhibit T.) After nearly a decade of silence, in January 2026, Lee Beaman instructed a Delaware law firm to suddenly contact Plaintiff seeking confidential information about Ecogensus in a pressured manner. There was no direct communication from Beaman to Plaintiff as a precursor, and no indication that the sudden demand was forthcoming. The demand's stated purpose was to call a meeting of Ecogensus' members to discuss Distributions (despite there not having been any), communicate with them about the 'value' of Ecogensus, and, ironically, understand "the value" of his ownership interest.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 1121 (Lanham Act). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant ZGW maintains its principal place of business in McKinney, Texas (Collin County), which is within the Sherman Division of this District. Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including ZGW's filing of the trademark applications at issue from its Collin County headquarters, ZGW's operation of its business from this District, and Defendant Blackard's direction of ZGW's commercial and intellectual property activities from this District. The registered owner address for both trademark registrations at issue is ZGW's McKinney, Texas office within this District. On information and belief, Defendant Blackard resides in this District. On information and belief, Defendant Santorum frequently travels to and conducts business in this District in connection with ZGW's affairs.

26. Plaintiff brings this action in his individual capacity. The personal intellectual property interests at issue in this action are not subject to or governed by any other agreement with Defendants or any of their partners or associates, including the Rhino supply agreement between SRF Technology Licensing Europe East, LLC and ZGW, to which Plaintiff is not a party.

## FACTUAL BACKGROUND

### A. The Trademark Scheme -- Canary in the Coal Mine

27. Defendants secretly filed United States trademark applications to register Plaintiff's process and product under fabricated names, while misleading Plaintiff that they were developing "brand and corporate communications" to deal with their "notable scrutiny from local NGOs in Croatia" and seeking Plaintiff's input. (Exhibit K.) They tried to sneak a clause about "CIRCULÜM" and "EDUNITE" being their inventions into a territory Rhino supply agreement, but it was caught by Plaintiff's colleague. (Exhibit U.) By then, they were concealing that they already had submitted applications to the USPTO. They kept trying to retroactively engineer approval for their wrongdoing or at least create the appearance of buy-in. Under the guise of facility planning with Ecogensus, they reached out to Plaintiff's colleague (who explained that intellectual property matters were Plaintiff's domain.) They misled Plaintiff and his colleagues, once stating remarkably that George Soros-funded opposition groups in Croatia were supposedly reading Ecogensus patents and seeing the word "pyrolysis" (a different process than Plaintiff's) and then equating that to waste combustion, and therefore protesting Defendants' site, which somehow could be remedied by ZGW embarking upon an Edunite and Circulum branding campaign, which they then ended up describing in USPTO filings as, incredibly, a pyrolysis process. (Exhibit V.).

28. Defendant's "CIRCULÜM" filing, describing the process as invented by Plaintiff but falsely states it is a pyrolysis process, creates significant damage to Plaintiff. Pyrolysis is a high temperature decomposition process typically above 400° C to produce syngas and liquid oil. On information and belief, ZGW's investor Providence Energy invested in a pyrolysis company called Monarch Waste Technologies. Plaintiff's technology in question is a materials manufacturing

process, it operates below 200° C, at the temperatures of other manufacturing processes. The patents that were assigned by Plaintiff to Ecogensus explicitly stated "without the formation of syngas"; which scientifically means it cannot be pyrolysis. Indeed, Defendants were correct in stating that Plaintiff's patents mention the word "pyrolysis" -- in a background section to distinguish conventional waste technology processes, including pyrolysis, and to explain the science of how Plaintiff's technology uses constructive thermochemistry below destructive pyrolysis temperature regimes.

29. Plaintiff invented a constructive thermochemical process for converting surface carbon resources, including municipal waste, industrial waste, biomass, and other carbonaceous materials, into advanced engineered materials. This is a manufacturing process operating at temperatures similar to or even below typical kitchen stove temperature. The process for materials manufacturing operates at temperatures between 170 -- 190°C (338 to 374° F) under vacuum conditions, causing the organic constituents of carbon-based feedstocks to undergo constructive molecular transformation. In the limited application of an engineered fuel production, the process is run to a maximum of 200°C (392° F). This is the opposite of pyrolysis, which degrades materials through destructive heating. Plaintiff designated this process "Dynamic Organic Repolymerization" or "DOR" and it is the personal intellectual property of Plaintiff.

30. The material produced by the DOR process is called "EGS-6", a reference to carbon as the sixth element. The Plaintiff also owns the EGS-6 trademark. EGS-6 material has a range of potential applications, including engineered composites, advanced carbon materials, and, at its lowest use case, as a cleaner substitute for coal in conventional power generation.

31. Plaintiff originated and adopted the designations "Dynamic Organic Repolymerization" and "DOR" for the broader engineered process framework he discovered and developed, and

originated and adopted "EGS-6" for the resulting platform material. Plaintiff used those designations in technical, business, and commercialization communications and continued to do so through the present. Neither the DOR designation nor the EGS-6 designation was transferred with any patent assignment.

32. The DOR and EGS-6 designations, and all goodwill associated with them, remain Plaintiff's personal property. Ecogensus uses those designations pursuant to a limited, revocable license, subject to Plaintiff's control over the nature and quality of goods and services offered under those designations and subject to Plaintiff's approval rights regarding substitute branding. Plaintiff has continuously used the DOR and EGS-6 designations since their adoption and has exercised quality control over Ecogensus's use of those designations.

33. Ecogensus holds certain specific patented embodiments covering particular feedstock combinations, processing parameters, and system configurations, contributed by Plaintiff. The broader DOR field, the DOR and EGS-6 designations, and all applications of DOR outside the scope of those contributed patents remain with Plaintiff, including purely biogenic applications covered in part by a provisional patent application filed by Plaintiff in his individual name. Defendants' CIRCULÜM filing describes thermochemical processing of municipal waste without limitation. This is broader than anything ZGW was ever licensed to practice. The filing thus purports to claim naming rights over applications of Plaintiff's technology that were never contributed to any entity, directly injuring Plaintiff's individual commercialization rights.

34. Plaintiff has been the sole naming authority for his inventions at every stage of development, originating designations including "EGS-5000L" for the modular system, "Project Phoenix" for his engineered composites initiative, and "CarbonFill" for presentation materials to prospective partners. ZGW sought Plaintiff's consent to replace this inventor-controlled

nomenclature with marks owned by ZGW. When Plaintiff did not approve, ZGW filed at the USPTO without his knowledge or consent, and continued to solicit his endorsement of the name concepts as though no filing had occurred.

**B. Origins of the Relationship**

35. In February 2016, shortly after Defendant Santorum withdrew from the U.S. Presidential race, Plaintiff was asked to meet with him regarding his technology. Santorum expressed enthusiasm for the technology and, over the months that followed, involved himself in Plaintiff's companies' affairs.

36. On or around April 2016, Plaintiff traveled to Dallas, Texas to meet the founder of Earth Day Texas (now EarthX). During that visit, Plaintiff was asked to attend a meeting at the offices of Providence Energy, Inc. Defendant Blackard, unknown to Plaintiff, was present and drove Plaintiff to meetings that day, identifying himself only as the driver. At the end of the day, Blackard dropped Plaintiff off and handed him a business card for "Blackard Global," stating that if Plaintiff was ever back in town and needed anything, he should call.

37. In early 2017, Defendant Santorum insisted that his friend Blackard, who was then represented to be building a hotel in Croatia, be given the opportunity to incorporate Ecogensus technology at or near the resort. This project never came to fruition. At the time, Senator Santorum's associate (and former intern) was acting as counsel to Ecogensus. This associate, the same man who recently authored the buy-off proposal sent to Plaintiff, then pushed for the relationship with Blackard's group, suggesting that it could be a positive arrangement.

38. In or around June 2017, Plaintiff grew concerned that a Croatian manufacturer was being introduced into the arrangement to conduct intelligence gathering on the technology. Plaintiff was warned that challenging the arrangement could provoke a severe reaction from

Santorum. After the Santorum-organized delegation visit to Ecogensus' X-Lab research facility, Santorum wrote to Plaintiff: "You did an outstanding job yesterday with Team Croatia." Santorum added that "immediate feedback was great and even more enthusiasm this morning," and stated that a member of the delegation would "vouch for the efficacy and safety of the system to the government." Plaintiff had not authorized any communications with the Croatian government regarding his technology, nor had Plaintiff been informed that such communications were contemplated.

39. Blackard then moved forward seeking a license agreement. At the last moment, Blackard stated that he wished to use a new entity, Zero Global Waste, LLC, formed specifically for the license, which despite its name was limited to a small territory centered around Eastern Europe. Years later, Plaintiff and Ecogensus would discover that on August 28, 2017, eighty percent (80%) of ZGW's initial capitalization came in fact from Providence Energy. Just around three months before Senator Santorum had brought Defendant Blackard and his Croatia hotel project forward, he had arranged for his associate, then acting as Ecogensus counsel, to send confidential investment materials to Mike Allen, Providence Energy's CEO.

40. To summarize, the very first person Senator Santorum introduced to Plaintiff was Mike Allen of Providence Energy, on a day where Defendant Blackard was present the entire day as 'the driver.' Months later, Senator Santorum would use his former intern, then inside Ecogensus as a young lawyer, to send confidential information about Ecogensus and its capital raising to Mike Allen. Three months later, Senator Santorum would bring Defendant Blackard forth as a hotel developer seeking sustainable recycling solutions, leading to a Memorandum of Understanding with his real estate company and X-Lab visits for Croatian nationals. A few months later, this

would transform into a broader equipment supply agreement with exclusive development rights for several countries, secretly backed by none other than Providence Energy.

**C. The First Romanian Connections**

41. In early November 2018, Senator Santorum worked through his associate, then inside Ecogensus, to arrange a call with Gabriel Comanescu, the president of a Romanian conglomerate named Grup Servicii Petroliere ("GSP"). Senator Santorum explained that he had recently, on information and belief, the summer of 2018, been on Mr. Comanescu's yacht and that he had a close relationship now. Plaintiff was asked to join a brief call to describe his technology at a high level, which Senator Santorum insisted was a necessary business courtesy for their efforts to purchase Rhino systems for the region. The call had an extremely poor connection and Plaintiff did not understand the purpose of the introduction, with Senator Santorum only explaining that they were strengthening relationships in the region for ZGW's commercial pursuits and that, therefore, Plaintiff should simply champion the technology. Plaintiff heard nothing more about this for years.

42. On information and belief, a subsequent investigation revealed that an entity now known as Providence Energy SRL (Romanian Commercial Unique Identifier 39591891), registered at the headquarters of the Romanian conglomerate in Voluntari, Ilfov County, Romania, was originally established in July 2018 as a subsidiary of that conglomerate. (Exhibit Q.) At some point prior to June 2023, the entity was renamed to bear the Providence Energy name. On or around July 2023, it was reported that the conglomerate's principal transferred fifty percent of the entity's shares to Providence Investments International LLC, a Dallas-based affiliate of Providence Energy.

43. The significance of this connection would become apparent years later, when Defendants suddenly insisted that this same Romanian conglomerate be designated a "Preferred Manufacturing Partner" for Rhino processing systems, with extraordinary measures being taken to ensure that Plaintiff acquiesced.

**D. The Croatia Situation**

44. Having successfully started operating the first Rhino 5000L (then known as the EGS-5000L) in 2020 and then having learned of Plaintiff's technical advancements in engineered materials and biosafety applications, Defendants knew the value of the technology. On August 2, 2021, Defendant Santorum sent a letter to the Prime Minister of Croatia, with copies directed to the U.S. Senate Committee on Environment and Public Works and a sitting United States Senator. In that letter, Santorum described the technology as "transformational" but stated that the system they had was being "held hostage indefinitely" by a Croatian businessman. Santorum wrote that his "company, Zero Global Waste, has faced not only an unscrupulous Croatian businessman . . . but his corrupt influence of some in the government." The email attaching this letter was sent from Santorum's personal email address and copied to Defendant Blackard. Plaintiff knew nothing of this letter and, in fact, previously had only heard very positive things from Defendants about their local Croatian partner. Plaintiff had been told as early as November 2017 that Defendant Blackard was selling 10% of ZGW to their local Croatian partner, information that was passed along by Senator Santorum to his associate.

45. In a separate communication dated May 19, 2021, Defendant Blackard wrote to the U.S. Embassy in Zagreb with the subject line "American Technology Extorted in Croatia." The Embassy's Head of Commercial Section responded and arranged for the matter to be raised with

Croatian government ministers. The Embassy in turn enlisted the FBI Legal Attaché in Zagreb. Neither Plaintiff nor Ecogensus authorized or were consulted about any of these contacts.

46. Nevertheless, Defendants were bullish in 2021, with Defendant Blackard writing a glowing review of Plaintiff's technology to his partners, even acknowledging attempts to "disprove" claims. Defendant wrote in October 2021:

> We tried to disprove what we thought may be too good to be true, but we continued to have the same realization that every solution we came across fell into a cleanly defined dichotomy: either it didn't function economically without some form of subsidy, benefaction, or currently unrealistic pricing scenario or it really didn't help address the problem that well. The technology we had licensed was, and remains to this day, the only solution we can find that can perform exceedingly well for financial stakeholders under realistic economic conditions while serving the communities that we serve in a meaningful way. The technology deal that we had thought before would generate a handsome return for investors looked increasingly like it may be a real solution to one of the world's most pressing issues.

Independent laboratory testing of material produced by the process at ZGW's facility yielded extraordinary results: energy content of 24,714 BTU per pound, moisture content of 0.4%, and carbon content of 67.45%. ZGW's own Q3 2021 Partners Update, authored by Defendant Blackard, reported these results and characterized the testing as "very successful." (Exhibit G.) While these energy characteristics are remarkable, use as a coal substitute represents only the lowest-value application of the material's potential. The technology's broader applications in engineered composites and advanced carbon materials represent far greater commercial significance.

47. In that same writing, Defendant Blackard touted the results of their testing of Plaintiff's technology and also specifically wrote "Although extreme thermal treatments like…pyrolysis exist in some highly advanced economies, they are too expensive in almost all cases, create unwanted emissions, and are almost universally unavailable in all of Zero Global Waste's license area"

(Exhibit G.) Yet, just months earlier, Defendant Blackard communicated to U.S. government officials describing Plaintiff's technology as "low grade pyrolysis". (Exhibit C.)

48. Over the course of 2021, ZGW raised millions of dollars, including from Lee Beaman and Providence Energy. (Exhibit T.) Defendant Blackard wrote to his partners that they had made a down payment for a massive 120,000 square foot facility in Novi Marof, Croatia and that the planned capacity was for 60 Rhino systems. The partner update also contained pictures of Plaintiff's engineered composite samples, that Defendant Blackard had obtained. (Exhibit G.)

**The Novi Marof Facility**

49. ZGW secured the Novi Marof site in the first quarter of 2021, making an initial 500,000 EUR deposit. The Novi Marof site sits directly on the Zabok-Ludbreg DN500/50 bar high-pressure gas transmission corridor, which began carrying gas from Croatia's Krk LNG terminal when commercial operations started in the first quarter of 2021. The Krk LNG terminal began construction in August 2017, upon information and belief. Right on the edge of the Novi Marof property sits the MRS Podrute measuring-reduction station, a critical node that connects to the gas line and allows for gas offtake. Just this month, March 2026, the Zabok-Lucko pipeline was connected to the existing international gas pipeline at Rogatec, completing the corridor and for the first time enabling the full commercial flow of LNG from the Krk terminal through Zabok, directly past the MRS Podrute station at Novi Marof, toward Hungary and Slovenia at volumes up to 3.5 billion cubic meters per year.

50. After securing the Novi Marof site, Blackard asked to meet with Plaintiff one-on-one in the summer of 2021, where he showed Plaintiff a plan to manufacture Rhino systems on-site, despite having no such rights.

**E. The Expansion Campaign**

51. In January 2022, ZGW renewed strategic discussions and Will Allen of Providence Energy became directly involved. Then, in February, Mladen Jozinovic, a ZGW operator, wrote that a court settlement had given ZGW possession of the Rhino system in Croatia, such that they could move it to Novi Marof. The unnamed participant in the communications, a former graduate of the U.S. Navy Fighter Weapons School responded: "Like landing on the moon . . . this is a significant day."

52. In spring 2022, Will Allen of Providence Energy stated to Plaintiff that ZGW's machine had been idle for approximately a year, which Allen acknowledged was ZGW's responsibility, not Plaintiff's or his company's. Allen also acknowledged that another party had attempted to blame Plaintiff for the entirety of the problems ZGW had, allegedly at least, experienced. While Providence's own principal was privately conceding fault, ZGW was publicly escalating its demands.

53. That spring of 2022 marked a series of meetings that took place at Providence Energy's offices in Dallas. ZGW and Providence repeatedly represented that they sought a good-faith partnership of significant scale with Plaintiff. On April 7, 2022, Defendant Blackard wrote to Plaintiff: "I'm eager to get your thoughts on the concept that we're working on and hope to put into action in the weeks to come." The materials proposed the names "Circulüm" and "Edunite" as substitute names for Plaintiff's process and product. (Exhhibit K.) Plaintiff did not approve the proposed names, did not authorize ZGW to file or own them, and did not execute any document consenting to such rebranding.

**F. The Spring 2022 Trademark Filing**

54. Notwithstanding that lack of approval, and without disclosing its intent to do so, ZGW filed two intent-to-use trademark applications with the USPTO on April 20, 2022, thirteen days after Blackard's solicitation of Plaintiff's input: (a) Application Serial No. 97/372,919 for the mark "CIRCULÜM" (International Class 40: "Recycling of waste and trash; Processing of municipal waste by use of a thermo-chemical process"), which matured to Registration No. 7,580,623, registered November 26, 2024; and (b) Application Serial No. 97/372,905 for the mark "EDUNITE" (International Class 4: "Fuel created from converted and recycled municipal waste"), which matured to Registration No. 7,148,566, registered August 29, 2023.

(a) Application Serial No. 97/372,919 for the mark "CIRCULUM" (International Class 40: "Recycling of waste and trash; Processing of municipal waste by use of a thermo-chemical process"), which matured to Registration No. 7,580,623, registered November 26, 2024; and

(b) Application Serial No. 97/372,905 for the mark "EDUNITE" (International Class 4: "Fuel created from converted and recycled municipal waste"), which matured to Registration No. 7,148,566, registered August 29, 2023.

55. Six days later, on April 26, 2022, without disclosing the trademark filings, Blackard sent a message to Plaintiff, copying Mike Allen and Will Allen of Providence Energy, proposing a massive expansion of ZGW's exclusive territory to include South America, Asia, and "the entire African continent," all for no money down. Having learned of Ecogensus's collaboration with KPMG to create a carbon credit commercialization pathway, ZGW proposed "incorporating a carbon credit royalty scheme" whereby ZGW would receive ninety percent (90%) of all gross carbon credit revenues from these territories. ZGW stated it was "imperative that ZGW be granted

the right to guide and manage the manufacturing of systems inside of our territories" and offered to pay Ecogensus seven percent (7%) of the cost for providing what ZGW described as "flexibility" and the "profit that they are foregoing." ZGW further requested "modifying brand provisions" -- without disclosing that six days earlier, ZGW had already filed trademark applications to rename Plaintiff's process and product under marks owned by ZGW. The proposal also referenced interest in Texas. ZGW thus sought to negotiate for broader territorial, manufacturing, and branding rights after it had already filed to own the proposed substitute marks in its own name -- a fact it did not disclose to Plaintiff.

56. ZGW's own specimens submitted to the USPTO in support of the Circulum application contain the following admissions:

(a) "The Circulum process was developed by inventor Bjornulf Ostvik in [2015] in response to the urgent need for a solution to waste management across the globe";

(b) "The Circulum process, invented by Bjornulf Ostvik and utilized in Ecogensus systems, converts various forms of waste into Edunite"; and

(c) "Circulum is a globally patented process."

57. By using those statements, ZGW tied its proposed substitute marks directly to Plaintiff's identity and Plaintiff's inventorship in order to legitimize ZGW's branding effort. The materials show that ZGW was not presenting Circulüm and Edunite as marks for goods or services independently originated by ZGW. ZGW was presenting substitute names for a preexisting process and output. ZGW could never be the producer of the Rhinos, without rights they did not have. Notably, the CIRCULÜM specimen does not describe a fuel product or a waste-to-fuel process. It describes "the process" without limitation, a process it attributes to Plaintiff, thus showing its breadth.

58. Plaintiff never authorized ZGW to file for, register, or own Circulüm or Edunite. Blackard had represented that documents would be presented for approval of branding concepts, citing he desired to use them in Croatia. No such approval documents were ever sent to Plaintiff, no such documents were ever executed by Plaintiff, and Plaintiff never granted written or oral consent for ZGW to claim ownership of the proposed marks. Plaintiff did not discover that Defendants had obtained federal trademark registrations for his process and product until approximately February 2026.

**G. 2022 Escalation Begins**

59. Plaintiff was alarmed by the scope of ZGW's demands but did not immediately reveal this. On May 5, 2022, a detailed five-page letter was sent to Blackard, Mike Allen, Will Allen, and Jed Rollins (of ZGW), praising their ambitions and leadership but explaining in detail why the proposal was unworkable. The letter stated that there were no plans to enter into new territory agreements and that it would be "cost-prohibitive to ZGW to acquire all-encompassing rights as proposed." The letter explained that control of system manufacturing must be retained and stated: "Thus, fractioning off the enormous value represented by the world's most populous countries does not make economic sense." ZGW's rebranding proposal was not entertained.

60. On June 29, 2022, Defendant Blackard said to Plaintiff: "This is my last chance to take a run at you, before you get too big."

**H. Blackard Will "Kill the Deal" Without Romania Manufacturing**

61. In July 2022, Defendant Blackard warned Frank Harris, Plaintiff's colleague, that he would "kill the deal" if European manufacturing was not agreed to. He claimed that they were seeking or possibly already had a $30 million investment from the Romanian government, but did not share any more details.

62. On August 1, 2022, Plaintiff wrote to Blackard raising concerns about ZGW's handling of the technology in Croatia, including its permit filings which had caused all development to stall. Plaintiff specifically asked: (a) "Why no input from Ecogensus?" (b) "Any reference to Ecogensus?" (c) "Why was a pyrolysis process referenced?" - noting that Ecogensus does not practice pyrolysis.

(a) "Why no input from Ecogensus?"

(b) "Any reference to Ecogensus?"

(c) "Why was a pyrolysis process referenced?" -- noting that Ecogensus does not practice pyrolysis.

63. Plaintiff further asked ZGW to confirm that the system was intact and that there were no intellectual property breach concerns, specifically:

(a) Whether representatives of the Romanian conglomerate had accessed the system, taken photos, or created drawings;

(b) Whether any other third party, including a Bosnian company, had accessed the system for a manufacturability assessment; and

(c) That "Ecogensus has an important vested interest in protecting its IP and needs to be alerted if any of these occurred, for further investigation."

64. When Defendants could not wrest any more technical information from plaintiff, they turned to Ecogensus-trained assembler. On August 11, 2022, Defendant Blackard contacted Chris Werner, CEO of Titan, seeking to procure auxiliary equipment directly from Titan for ZGW's operations, or at least manufacturing information, without authorization. On August 12, 2022, Werner responded, stating incorrectly that he "understand[s] that the auxiliary equipment is not proprietary in nature" but acknowledging that Titan's "overall knowledge of the comprehensive

design does include this equipment" and that Blackard "would need to get authorization from Ecogensus to allow Titan to provide any equipment that is part of the overall system design." Werner copied Plaintiff on this response. In fact, the auxiliary equipment module is the subject of an issued United States patent and forms part of Ecogensus's proprietary system and process. On information and belief, by 2025, Werner and Titan were interacting regularly with ZGW, with Titan planning travel to Croatia to support ZGW's operations.

**I. August 2022 -- Intimidation and Criminal Threat Campaign Begins**

65. In August 2022, after Plaintiff had refused to allow Defendants to become the producer of systems, expand territory, and grant branding consent, and approximately four months after filing the trademark applications, Defendant Santorum sent a series of text messages directly to Plaintiff's mobile phone. Over two days, Santorum's messages escalated in urgency and tone, culminating in: "From our history I am well aware of that you avoid potentially difficult conversations. I assure you I am trying to help you avoid real discomfort." (Exhibit H.)

66. Not long after, a person identifying himself as Pastor Richard Ellis of Reunion Church, a person Plaintiff has never met or heard of, left a voicemail on Plaintiff's phone, stating that he was a friend of Senator Santorum and Defendant Blackard and had received Plaintiff's mobile number from them. He proceeded to leave a lengthy prayer for Plaintiff, his wife, and his mother-in-law, who was dying of Stage 4 cancer. He encouraged Plaintiff to call him. Plaintiff did not respond.

67. On September 6, 2022, Defendant Blackard admitted he had contacted Bill Gress, a member of Plaintiff's Board, in an attempt to disparage Plaintiff and enlist Gress's support against Plaintiff within his own company. The message was copied to Santorum, Lee Beaman, Mike Allen, and Will Allen. Blackard had obtained Gress's personal cell phone number without authorization.

68. In October 2022, Defendant Blackard and/or ZGW caused their Zagreb attorney to write directly to Plaintiff, announcing that ZGW's Croatian subsidiary would pursue misdemeanor and/or criminal proceedings against Plaintiff over a regulatory marking -- a matter that was ZGW's responsibility as the facility integrator, not Plaintiff's. (Exhibit W.)

69. Within days, ZGW's Texas-based counsel sent a separate communication threatening that multiple third parties, including GSP and Klemm Security, along with Romanian and Croatian parties, would bring claims against Plaintiff for "false and defamatory statements made in its public filings." The coordination of these threats -- criminal proceedings from Zagreb, followed within days by multi-party litigation threats from Texas naming specific foreign entities by name -- evidences that Defendants were directing a multi-jurisdictional intimidation campaign designed to compel Plaintiff's acquiescence.

**J. The Grup Servicii Petroliere (GSP) Romanian Manufacturing Clause**

70. That past summer of 2022, Will Allen of Providence Energy had shared with Plaintiff that Providence was in discussions with Gabriel Comanescu about a "$9 billion gas deal," stating they had met with him in Washington, D.C. On information and belief, Providence and potentially their partners were going to supply natural gas to Romania, but needed to do so through Croatia, by importing gas into the new Croatian LNG port, which he stated Mladen Jozinovic of ZGW had "helped with." GSP would be their partner in Romania to help with distribution, as Allen described it. At the time, this was stated to Plaintiff not as related to ZGW, but as an explanation as to why Allen had been busy and not kept up with the latest ZGW matters.

71. Against this backdrop of threatened harm, Defendants pressured for the inclusion of a provision designating GSP as a "Preferred Manufacturing Partner" for Rhino processing systems.

Plaintiff and his colleagues agreed, the entire pressure campaign seemed to come down to one central thing: writing in GSP as the preferred manufacturing partner of Rhino systems.

72. On information and belief, GSP specializes in fabricating and installing natural gas infrastructure components. Neither Plaintiff nor his colleagues had ever been to Romania, met with GSP, shared technical information, evaluated their manufacturing capabilities, or had any substantive interaction with the company -- with the sole exception of the single, brief telephone call arranged by Defendant Santorum in November 2018.

73. On information and belief, Defendants' insistence on this clause was motivated by Providence Energy's separate business interests with the Romanian conglomerate, including the multi-billion dollar energy transaction referenced the past summer. This would prove true: once GSP was designated as a preferred manufacturing partner, not a single Rhino system was ever ordered, and in July 2023, a few months after the designation was achieved, the Providence Romanian entity deal was reported. (Exhibit Q.)

**K. The Allen Meeting in the Woodlands**

74. The Allens took prompt notice when a protective motion had been filed weeks earlier in New York Supreme Court. The filing occurred after an audit had been performed and Plaintiff and his colleagues first saw evidence of the Romanian connection -- though at the time the concern was breach of intellectual property and actual manufacturing of the technology in Romania. This belief stemmed from a document that appeared to be a solicitation of manufacturing in Romania of Plaintiff's technology, but held out to be that of ZGW's using the Circulum reference. (Exh Y.)

75. After the filing, Mike Allen and Will Allen acted quickly to contain the situation, flying to meet with Plaintiff and his colleague Frank Harris. At the outset of the meeting, Mike Allen handwrote a note and handed it to Plaintiff, purporting to absolve himself of liability: "The

discussion w. Frank Harris & Bjornulf are free from any liability or recourse," and signed it "personally & investor." (Exhibit I.)

76. The Allens promised it was a meeting in good faith. Plaintiff informed Allen that he wished to pursue advanced engineered composites and carbon materials as the primary commercial pathway for the technology. Plaintiff had by this time already produced engineered building materials, demonstrated them to Defendants, and filed patent applications for advanced materials applications. Mike Allen responded that his interest was in fuel, citing personal connections to senior utility company executives. The Allens sought to end the public litigation and insisted they were interested in a Texas joint venture, but needed to "Get Jeff Blackard back into the real estate business" to do so.

**L. The Buy-Off Attempt**

77. After the GSP manufacturing clause was achieved, the pressure subsided. No Rhino systems were ordered. No manufacturing commenced. The single Rhino in Croatia sat idle. Then, in or around spring 2025, Plaintiff was suddenly informed that Defendant Santorum, Providence Energy, and ZGW were interested in acquiring Plaintiff's interest in his companies. It was represented that any proposal would be made in good faith. Plaintiff requested that any offer be put in writing.

78. Plaintiff was further informed during these discussions that the reason the interested parties were reluctant to memorialize their proposal in writing was that "they don't wanted to be accused of a RICO conspiracy."

79. On May 14, 2025, a written offer arrived -- not from Providence Energy, but from Sanctus Capital Advisors, Inc., an entity founded and controlled by Matthew Pacella, Plaintiff's former outside counsel. On information and belief, the Chief Administrative Officer of Sanctus

Capital Advisors is Defendant Santorum's son-in-law. On information and belief, Sanctus Capital Advisors is not a registered broker-dealer.

80. The proposal was not a bona fide acquisition offer. It was addressed to Plaintiff personally and sought to weaponize his Founder position: Plaintiff was asked to step aside and allow Defendants to lift Plaintiff's companies and their intellectual property into a new holding company under their control, install a new chief executive officer, and obtain releases from Plaintiff's co-investors "without disparaging" Plaintiff. Plaintiff was offered a sum less than 2% of the value of Ecogensus alone, for "finality." The buy-off structure sought to bypass the interests of Plaintiff's co-investors entirely, who otherwise would have had equal standing with Plaintiff in a liquidity event. In exchange for between $3.5 million and $7.5 million, Plaintiff was being asked to abandon his co-investors and remain silent, so his entire technology portfolio could be transferred to a 'holding company' that Senator Santorum's associate, and his partners (which included Senator Santorum as referenced later) would control. Plaintiff refused.

81. Plaintiff rejected the proposal. In a June 10, 2025 response, Pacella acknowledged that he had spoken to "Rick" about whether "Mike" -- referring to Mike Allen of Providence Energy -- was interested in a buyout, and that "to his knowledge Mike is not," but that nevertheless "Providence may be a target that makes sense for the companies." In the same communication, Pacella, who Plaintiff has not spoken with in nearly seven years, randomly volunteered an assessment of Plaintiff's supposed concerns of "corporate espionage, IP theft, personal vendettas, tortious interference, legal claims against you, fraud of counterparties" as "fears" that "dictate decision making." That Pacella felt the need to preemptively characterize these as mere 'fears' raises its own questions.

**M. The Current Intimidation Campaign Underway**

82. On information and belief, on January 9, 2026, Grup Servicii Petroliere (GSP) entered into formal insolvency proceedings. A key operating subsidiary, GSP Offshore, had already entered insolvency earlier in July 2025 with significant reported debts. Such proceedings, currently underway, on information and belief, typically cause once-private information regarding contract histories and third-party relationships to become public.

83. Plaintiff knew in the fall of 2025 that a new wave of intimidation and pressure was coming, but thought it might have to do with ZGW reaching performance milestone requirements of its fifth iteration of an equipment supply agreement that it could not meet. In October 2025, Plaintiff's colleague received a fresh threat of 'criminal proceedings' in Croatia if sworn testimony from 2022 in New York was not publicly retracted. (Exhibit L.) Around the same time, on information and belief, Lee Beaman's attorneys were gathering information about Plaintiff.

84. On the morning of January 12, 2026, Will Allen of Providence Energy contacted Plaintiff's colleague Frank Harris for the first time in approximately three years. Less than approximately three hours later, a prominent Delaware law firm served a books and records demand on Ecogensus on behalf of Lee Beaman -- who had acquired a small interest through a trust introduced by Defendant Santorum approximately ten years earlier. The demand was styled in Beaman's personal name, despite the fact that he had never been a member of the company in his personal capacity. The demand sought corporate and financial information, foreshadowing that if the inspection of these documents revealed what it characterized as "egregious misconduct," contact with Members would ensue. The suggestion that a routine books and records inspection of a technology company founded, funded, and operated by its inventor could reveal "egregious misconduct" was, on its face, a continuation of the same pressure tactics alleged throughout this

Complaint -- designed not to uncover wrongdoing, but to manufacture a pretext for further interference.

85. Allen's call to Harris -- the first contact in three years, placed hours before the demand arrived -- was not coincidental. On January 16, when Harris confronted Allen about the demand, Allen responded that he was "unaware" of it and that he "had to make some calls to find out what happened." Allen subsequently acknowledged to Plaintiff that he had in fact known of the pressure plan since the fall of 2025. Allen stated that ZGW's board had agreed to discontinue these tactics so that Allen could pursue discussions regarding Providence acquiring Ecogensus -- the same acquisition interest that had produced the Sanctus Capital proposal months earlier. Separately, on information and belief, another ZGW shareholder acknowledged to an Ecogensus advisor that the prior strategy of pressure against Plaintiff had not yielded results, and that a collaborative approach would be attempted.

86. In February 2026, another shareholder of ZGW and friend of Senator Santorum warned that supposed European customers -- who cannot exist, as there are none -- had filed lawsuits alleging that machines are not functional. The only Rhino in Europe is the one in the possession, on information and belief, of Defendants, sitting now idle at the Novi Marof facility.

87. Plaintiff anticipates that the filing of this Complaint will provoke further retaliation from Defendants, consistent with the pattern alleged herein. Defendant Blackard has repeatedly referenced to Plaintiff and his colleagues that "we," referring to himself, Providence Energy, Senator Santorum, and others, maintain close relationships with all of the most senior Texas state officials and connections as well as in Washington, D.C. Plaintiff and his colleagues are in possession of evidence corroborating this, as alleged, including statements made directly by Defendant Blackard in 2025. Plaintiff includes this allegation to create a contemporaneous record

of these statements, not to accuse any government official of wrongdoing. To be clear, Plaintiff has no knowledge of any actual contact between Defendants with any official in the State of Texas, only the continued loaded reminders from Defendants that those relationships exist. Plaintiff files this action not out of a desire for conflict, but because every alternative -- silence, negotiation, forbearance -- has been met with escalation.

**COUNT I**

**False Advertising**

15 U.S.C. ss. 1125(a)(1)(B)

(Against All Defendants)

88. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

89. In commercial advertising and promotion, Defendants have made false and misleading descriptions of fact and false and misleading representations of fact regarding the nature, characteristics, qualities, and origin of their goods and services, including: (a) Representing through the Circulüm and Edunite marks and associated commercial materials that ZGW originated or owns the underlying process and product, when in fact the process was invented by Plaintiff, ZGW was licensed only to use the technology under specific limitations, and certain implementations are the subject of patents assigned by Plaintiff to Ecogensus; (b) Describing the technology as "pyrolysis" in communications with U.S. government officials, when in fact the process operates through constructive thermochemistry and the patent claims expressly exclude pyrolytic processes; (c) Offering Edunite fuel purchase contracts to international customers without disclosing that the underlying technology was invented by Plaintiff personally and that certain implementations are the subject of patents assigned by Plaintiff to Ecogensus; and (d)

Building an elaborate commercial ecosystem -- including a commodity exchange and carbon credit system -- around Plaintiff's patented process while misrepresenting ZGW as the source and owner of the technology.

(a) Representing through the Circulum and Edunite marks and associated commercial materials that ZGW originated or owns the underlying process and product, when in fact the process was invented by Plaintiff, ZGW was licensed only to use the technology under specific limitations, and certain implementations are the subject of patents assigned by Plaintiff to Ecogensus;

(b) Describing the technology as "pyrolysis" in communications with U.S. government officials, when in fact the process operates through constructive thermochemistry and the patent claims expressly exclude pyrolytic processes;

(c) Offering Edunite fuel purchase contracts to international customers without disclosing that the underlying technology was invented by Plaintiff personally and that certain implementations are the subject of patents assigned by Plaintiff to Ecogensus; and

(d) Building an elaborate commercial ecosystem -- including a commodity exchange and carbon credit system -- around Plaintiff's patented process while misrepresenting ZGW as the source and owner of the technology.

90. These false and misleading representations were disseminated through commercial advertising and promotion in interstate commerce, including: the ZGW website accessible in the United States at www.zeroglobalwaste.com, which as of the filing of this Complaint describes ZGW as "the pioneering creator of Circulum" -- directly contradicting ZGW's own USPTO specimens crediting Plaintiff as the inventor (Exhibit X); Edunite-branded fuel purchase contracts

offered to customers from ZGW's Texas headquarters; Circulüm-branded marketing materials describing a commercial ecosystem including a commodity exchange and carbon credit system; and the trademark specimens and associated commercial materials filed with and maintained by a United States federal agency. Defendants' domestic commercial activity -- including the filing and maintenance of U.S. trademark registrations, the operation of a U.S.-accessible website, and the direction of commercial operations from Texas -- provides a sufficient basis for Lanham Act liability independent of any foreign commercial activity.

91. Defendants Santorum and Blackard personally participated in and directed these activities. Santorum, as a board member, championed the technology to heads of state while ZGW misrepresented its origin. Blackard, as CEO, authorized or directed the trademark filings and the commercial materials containing the false descriptions.

92. As a direct and proximate result of Defendants' false advertising, Plaintiff has suffered and continues to suffer commercial injury, including injury to his reputation, his ability to commercialize his personal intellectual property, and the value of his published scientific work.

**COUNT II**

**False Designation of Origin**

15 U.S.C. ss. 1125(a)(1)(A)

(Against All Defendants)

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Plaintiff owns and controls the DOR and EGS-6 designations and never authorized ZGW to replace them with marks owned by ZGW.

95. Defendants adopted Circulüm and Edunite as substitute marks while ZGW was only a limited licensee, solicited Plaintiff's approval, filed intent-to-use applications at the USPTO without disclosure, and continued soliciting approval afterward as though no filing had occurred.

96. Defendants then used those substitute marks together with statements that the process was "invented by Bjornulf Ostvik," "utilized in Ecogensus systems," and "a globally patented process," thereby creating a likelihood of confusion as to Plaintiff's affiliation with, connection to, sponsorship of, or approval of ZGW's branding and commercial activities. Plaintiff has not endorsed, sponsored, or approved ZGW's use of these designations.

97. This claim is not based solely on inventorship of an idea or process. It arises from Defendants' unauthorized adoption and registration of substitute marks for technology they knew they did not have the right to rename, coupled with the use of Plaintiff's identity and Ecogensus references to imply authorization that was never given. Defendants were not independent producers claiming their own goods. They were licensees who used substitute marks to obscure the origin of a process their own federal filings attributed to Plaintiff.

98. To the extent Defendants contend that the CIRCULÜM mark describes only the specific patented process licensed to ZGW, Defendants had no lawful right to use that patented process in United States commerce and therefore could not acquire trademark rights through lawful use. To the extent Defendants contend that the CIRCULÜM mark describes a process broader than the licensed patents, the mark claims ownership of Plaintiff's personal intellectual property that was never licensed to ZGW or contributed to any entity. In either case, Defendants' use of the mark constitutes a false designation of origin.

99. To the extent the "origin" of goods refers to the producer of the tangible goods sold in commerce, ZGW is not the producer. The processing system was designed by Plaintiff, built by a

company Plaintiff founded, and sold to ZGW under a limited equipment supply and right-to-use agreement. ZGW operated that system but did not design, build, or manufacture it. The output material is produced by Plaintiff's patented process running on equipment ZGW purchased but did not create. ZGW's trademark registrations designate ZGW as the source of goods and services that ZGW did not originate in any sense of the word -- neither as the creator of the underlying process nor as the producer of the tangible goods. Defendants' own April 2022 proposal sought manufacturing rights precisely because ZGW did not yet have them. Nevertheless, ZGW's own website describes ZGW as "the pioneering creator of Circulum" -- while its own USPTO specimens credit Plaintiff as the inventor. These two representations cannot both be true and together constitute a false designation of origin regardless of how "origin" is defined. (Exhibit X.)

100. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer injury to his reputation, his commercial interests, and his ability to commercialize his personal intellectual property, including but not limited to the DOR process, the EGS-6 product designation, and the constructive thermochemistry framework, all of which are now falsely associated in the marketplace with marks owned by parties who did not invent the underlying technology and who lacked authorization to claim them.

**COUNT III**

**Cancellation of Trademark Registrations**

15 U.S.C. ss. 1119

(Against Defendant ZGW)

101. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Pursuant to 15 U.S.C. § 1119, this Court has the power to order the cancellation of trademark registrations.

103. U.S. Trademark Registration No. 7,148,566 ("EDUNITE") and U.S. Trademark Registration No. 7,580,623 ("CIRCULÜM") are subject to cancellation on multiple independent grounds.

104. Lack of Entitlement. ZGW was not entitled, under the governing license structure and branding provisions, to apply for or own exclusive trademark rights in substitute marks for Plaintiff's process and output without the required approval. The chronology -- April 7, 2022 solicitation of approval, April 20 filing without disclosure, April 26 request to "modify brand provisions," and continued post-filing requests for input through July 2022 -- shows that ZGW knew approval had not been obtained when it filed. ZGW was not the rightful applicant and was not entitled to claim exclusive rights in these substitute marks.

105. Lack of Bona Fide Intent. ZGW filed its trademark applications as intent-to-use applications pursuant to 15 U.S.C. § 1051(b), which requires a verified declaration of bona fide intention to use the mark in United States commerce. At the time of filing in April 2022, ZGW's license under the then-operative Third Amended and Restated Master License and Equipment Supply Agreement, dated March 2, 2021, was limited to European territories. ZGW had no rights to use the Technology in the United States, no U.S. operations, no U.S. customers, and no lawful path to U.S. commerce in the goods described in its applications. The subsequent Fourth Amended agreement, executed in February 2023, further reduced ZGW's territory. To the extent ZGW's intent was predicated on obtaining expanded rights from the Licensor -- including the U.S. rights ZGW demanded in April 2022 -- those rights were never granted, and the proposal to expand was rejected by Ecogensus in May 2022, weeks after the applications were filed.

106. Unlawful Use. Trademark rights under the Lanham Act can only be acquired through lawful use in commerce. ZGW could not lawfully practice Plaintiff's patented process in the United States without a license to do so. No such license was ever granted. Use of the marks in connection with goods or services that ZGW had no legal right to produce or offer would constitute unlawful use, which cannot give rise to valid trademark rights. The registrations are therefore void independently of the other grounds stated herein.

107. Misrepresentation of Source. The registrations are further subject to cancellation because the marks were used so as to misrepresent the source of the goods or services by coupling ZGW-owned substitute marks with express statements attributing the process to Plaintiff and Ecogensus systems. ZGW's verified declaration to the USPTO also represented that, to the best of its knowledge, no other person had the right to use the marks in a manner likely to cause confusion. ZGW's own specimens identify Plaintiff as the inventor and Ecogensus as the owner of the systems. ZGW knew that Plaintiff and Ecogensus held rights that ZGW lacked authorization to claim. This representation was false.

108. Fraud. To the extent the Court finds sufficient particularity and proof of deceptive intent, the registrations were also obtained fraudulently. On April 7, 2022, Defendant Blackard solicited Plaintiff's input on the proposed brand names, stating he was "eager to get [Plaintiff's] thoughts." Thirteen days later, ZGW filed the applications without disclosing to Plaintiff that it had done so. Blackard had stated that documents would be presented for Plaintiff's approval. No such documents were ever sent. ZGW's continued solicitation of Plaintiff's input through July 2022 -- months after the secret filing -- demonstrates that Defendants knew authorization had not been obtained and actively concealed the filing from the inventor they credited in their own specimens. These registrations should be cancelled.

**COUNT IV**

**Tortious Interference with Business Relations**

(Texas Common Law)

(Against Defendants Santorum and Blackard)

109. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110. Plaintiff has existing and prospective business relations in the commercialization of his personal intellectual property, including the constructive thermochemistry framework, the DOR process, and the EGS-6 product designation. Plaintiff also has business relations through Ecogensus's licensing of the patented technology.

111. Defendants Santorum and Blackard, through their personal conduct, willfully and intentionally interfered with these business relations by: (a) Directing the filing of trademark applications to register Plaintiff's inventions under fabricated names, creating marketplace confusion about who owns and controls the technology; (b) Personally pressuring Plaintiff through escalating communications, including Santorum's warning that Plaintiff should act to "avoid real discomfort"; (c) Stating to Plaintiff that "this is my last chance to take a run at you, before you get too big"; (d) Making false or misleading representations regarding the existence of European lawsuits to create false urgency and pressure Plaintiff into negotiations on terms favorable to Defendants; (e) Directly contacting a member of Ecogensus's Board of Directors in an attempt to disparage Plaintiff and enlist the board member's support against Plaintiff within his own company; (f) Enlisting third parties, including clergy, to contact Plaintiff about personal family matters as part of a coordinated pressure campaign; (g) Directing or coordinating threatening communications to Plaintiff's colleagues, including threats of foreign criminal prosecution for testimony given in prior legal proceedings; (h) Representing to Plaintiff and third parties that

ZGW's investors maintained relationships with senior elected and appointed officials, with the implication that Plaintiff should not challenge ZGW's conduct; (i) Orchestrating a buyout attempt through Plaintiff's former outside counsel at a fraction of the company's established value, designed to strip Plaintiff of control over his own technology; and (j) Forcing the designation of a Romanian conglomerate -- with which Plaintiff and Ecogensus had no relationship -- as a "Preferred Manufacturing Partner" under threat of foreign litigation, in furtherance of Providence Energy's separate business interests; and (k) Mobilizing a dormant ZGW shareholder to serve corporate books and records demands on Ecogensus through a prominent law firm, timed to coincide with a renewed acquisition approach, as a further instrument of pressure designed to extract confidential corporate information and manufacture pretexts for additional interference.

(a) Directing the filing of trademark applications to register Plaintiff's inventions under fabricated names, creating marketplace confusion about who owns and controls the technology;

(b) Personally pressuring Plaintiff through escalating communications, including Santorum's warning that Plaintiff should act to "avoid real discomfort";

(c) Stating to Plaintiff that "this is my last chance to take a run at you, before you get too big";

(d) Making false or misleading representations regarding the existence of European lawsuits to create false urgency and pressure Plaintiff into negotiations on terms favorable to Defendants;

(e) Directly contacting a member of Plaintiff's Board of Directors in an attempt to disparage Plaintiff and enlist the board member's support against Plaintiff within his own company;

(f) Enlisting third parties, including clergy, to contact Plaintiff about personal family matters as part of a coordinated pressure campaign;

(g) Directing or coordinating threatening communications to Plaintiff's colleagues, including threats of foreign criminal prosecution for testimony given in prior legal proceedings;

(h) Representing to Plaintiff and third parties that ZGW's investors maintained relationships with senior elected and appointed officials, with the implication that Plaintiff should not challenge ZGW's conduct;

(i) Orchestrating a buyout attempt through Plaintiff's former outside counsel at a fraction of the company's established value, designed to strip Plaintiff of control over his own technology;

(j) Forcing the designation of a Romanian conglomerate -- with which Plaintiff had no relationship -- as a "Preferred Manufacturing Partner" under threat of foreign litigation, in furtherance of Providence Energy's separate business interests; and

(k) Mobilizing a dormant ZGW shareholder to serve corporate books and records demands through a prominent law firm, timed to coincide with a renewed acquisition approach, as a further instrument of pressure designed to extract confidential corporate information and manufacture pretexts for additional interference.

112. Defendants' conduct was independently tortious and/or unlawful, including violations of the Lanham Act as alleged herein.

113. Plaintiff's claims for tortious interference are timely. Much of Defendants' conduct constitutes a continuing tort that persisted through at least February 2026, including the false

representations regarding European lawsuits and the coordinated Beaman demand. To the extent any discrete acts occurred outside the limitations period, Plaintiff did not discover and could not reasonably have discovered the full scope of Defendants' interference until approximately February and March 2026, when the trademark registrations and the coordination between the various pressure tactics first became apparent. The investigation and new facts are being discovered as recently as the last 24 hours prior to this filing.

114. As a direct and proximate result of Defendants' interference, Plaintiff has suffered damages, including but not limited to: disruption of Plaintiff's personal commercialization efforts and relationships with prospective partners for his individually-held intellectual property; interference with Plaintiff's ability to license and commercialize the DOR process and EGS-6 product designation; and the costs of addressing Defendants' pressure campaign rather than advancing the commercialization of Plaintiff's technology.

**COUNT V**

**Misappropriation of Name and Likeness**

(Texas Common Law)

(Against Defendant ZGW)

115. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

116. ZGW used Plaintiff's name -- "invented by Bjornulf Ostvik" -- in commercial documents filed with the United States Patent and Trademark Office in connection with ZGW's trademark applications for CIRCULÜM and EDUNITE. ZGW used Plaintiff's name to lend credibility and provenance to its applications, exploiting the commercial value of Plaintiff's identity as the inventor of a globally patented process.

117. ZGW's use of Plaintiff's name was without Plaintiff's knowledge or consent. Plaintiff did not authorize ZGW to associate his name with ZGW's trademark applications, commercial materials, or any branding effort by ZGW.

118. ZGW's appropriation of Plaintiff's name was for commercial advantage. By identifying Plaintiff as the inventor in its specimens, ZGW sought to establish the authenticity and value of its marks -- using Plaintiff's reputation and identity to support trademark registrations that Plaintiff never authorized and that claim ownership of Plaintiff's work.

119. As a direct and proximate result of ZGW's unauthorized use of Plaintiff's name, Plaintiff has suffered injury to his personal and professional reputation, his ability to control how his identity is associated with commercial products and services, and his ability to commercialize his personal intellectual property free from false associations with ZGW's activities. ZGW's conduct was willful and malicious, entitling Plaintiff to exemplary damages.

**COUNT VI**

**Common-Law Fraud (Fraud by Partial Disclosure)**

(Texas Common Law)

(Against Defendant Santorum)

120. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

121. The conduct giving rise to this Count occurred entirely in connection with Santorum's role as a shareholder and board member of ZGW, not in connection with any prior relationship with Ecogensus or any agreement arising from that relationship. This Count does not arise out of, seek to enforce, interpret, or adjudicate any rights under any agreements entered into by Santorum

with Ecogensus (or any affiliate) in or before 2016, and does not seek any relief concerning vesting, forfeiture, compensation, or ownership under such agreements.

122. On information and belief, Santorum knew -- at least by the time of his August 2022 text messages to Plaintiff -- that ZGW had already filed the CIRCULÜM and EDUNITE trademark applications in its own name without Plaintiff's approval. He also knew that he had previously written directly to the Prime Minister of Croatia and enlisted U.S. government officials (including the U.S. Senate Committee on Environment and Public Works, a sitting U.S. Senator, the U.S. Embassy in Zagreb, and the FBI Legal Attaché) on ZGW's behalf regarding Plaintiff's technology -- all without Plaintiff's knowledge or consent. He did not disclose his role in trying to expand ZGW's rights to the United States and beyond. Despite this knowledge, Santorum contacted Plaintiff directly and presented himself as a concerned neutral party who had the best interests of both companies in mind and who was trying to help Plaintiff "avoid real discomfort." Those statements and partial disclosures created the false impression that Santorum was acting as a good-faith intermediary in an ongoing business dispute. The statements were materially misleading because Santorum omitted the critical facts that the trademark applications had already been secretly filed, that he had conducted an unauthorized diplomatic campaign on ZGW's behalf, and that he was aligned with the ZGW-side effort to seize control of Plaintiff's technology and force a distressed sale of Plaintiff's interests. Having chosen to communicate directly with Plaintiff, Santorum assumed a duty not to make those communications misleading by omitting material facts.

123. Plaintiff, lacking actual knowledge of the secret filings or of Santorum's adverse alignment, relied on the false impression created by Santorum's partial disclosures by refraining from immediately directing counsel to oppose the applications, issuing a formal cease-and-desist,

alerting his board and investors to the rebranding attempt, or taking other protective steps while the applications remained undisclosed and continued to mature.

124. As a direct and proximate result of Santorum's fraud, Plaintiff suffered injury including increased difficulty and expense in challenging the registrations, continued marketplace confusion, further pressure to accept a suppressed buyout of his personal interests, and loss of the opportunity to oppose the trademark applications during the USPTO opposition period, which closed without Plaintiff's knowledge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

1. A permanent injunction enjoining Defendants and their agents, officers, employees, successors, and assigns from using the marks "Edunite," "Circulum," or any confusingly similar designation in connection with Plaintiff's inventions, Ecogensus's patented technology, or the products thereof, including an order requiring Defendants to take all steps necessary to remove, recall, or correct any materials in commerce bearing the marks EDUNITE or CIRCULUM, and to withdraw any statements filed with the USPTO or other agencies that reference Plaintiff or Plaintiff's technology in connection with those marks;
2. An order directing the Commissioner for Trademarks to cancel U.S. Trademark Registration No. 7,148,566 ("EDUNITE") and U.S. Trademark Registration No. 7,580,623 ("CIRCULUM") pursuant to 15 U.S.C. ss. 1119;
3. An award of Defendants' profits, Plaintiff's actual damages, and treble damages pursuant to 15 U.S.C. ss. 1117(a);

4. A finding that this is an "exceptional case" warranting an award of reasonable attorneys' fees pursuant to 15 U.S.C. ss. 1117(a);
5. An award of costs of this action;
6. Pre-judgment and post-judgment interest;
7. An award of compensatory and exemplary damages for the unauthorized commercial appropriation of Plaintiff's name;
8. An award of compensatory and exemplary damages against Defendant Santorum for fraud by partial disclosure;
9. Such other and further relief as this Court deems just and proper.

**RESERVATION OF RIGHTS**

Plaintiff expressly reserves all rights to seek additional relief, including but not limited to claims for breach of contract, breach of warranty, fraud, conspiracy, unjust enrichment, misappropriation, and any other claims arising from the facts alleged herein, in an amended complaint, supplemental complaint, or separate proceeding. This reservation includes claims that may be brought by Ecogensus, LLC, SRF Technology Licensing Europe East, LLC, or any other entity in which Plaintiff holds an interest.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Bjornulf Ostvik, Pro Se
8000 Research Forest Drive, Ste. 115-203
Spring, TX 77382
(713) 491-2205
officialbjornulf@gmail.com
Dated: March 12, 2026